IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GEORGE LEE CAMPBELL,

          Petitioner,

vs.

R. E. BARNES,

          Respondent.

_____/

No. CIV S-08-2755-TJB

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DIRECTING CLERK OF COURT TO ENTER JUDGMENT; AND DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY

## I.  INTRODUCTION

Petitioner George Lee Campbell is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.  *See* Pet'r's Consent 1, ECF No. 5; Resp't's Consent 1, ECF No. 9.  For the following reasons, the habeas petition is denied.

## II.  PROCEDURAL HISTORY

On April 26, 2007, Petitioner was convicted of:  (1) unlawful driving or taking of a vehicle without the consent of the owner, CAL. VEH. CODE § 10851(a); and (2) buying or receiving a stolen vehicle, CAL. PEN. CODE § 496d(a), by a jury in Sacramento County Superior Court.  *See* Lodged Doc. No. 1, Clerk's Tr. 5; *see also* Lodged Doc. No. 6, at 1.  Petitioner

1

"waived his right to a jury trial on his prior convictions," and the trial court found true that

Petitioner:  (1) "had four previous [California] Vehicle Code [S]ection 10851, subdivision (a)[,]

convictions;" and (2) "served five prior prison terms, one of which was a prior serious felony."

Lodged Doc. No. 6, at 2.  On May 31, 2007, Petitioner was sentenced to thirteen years in state

prison.  *See* Lodged Doc. No. 1, at 175; *see also* Lodged Doc. No. 6, at 1.

Petitioner directly appealed to the California Court of Appeal, Third Appellate District.

*See* Pet'r's Pet. 2, ECF No. 1.  On August 15, 2008, the California Court of Appeal issued a

reasoned decision "strik[ing] one of the one-year enhancements," and otherwise affirming

judgment.  Lodged Doc. No. 6, at 2.

On September 18, 2008, Petitioner filed a petition for review in the California Supreme

Court.  *See* Lodged Doc. No. 7.  On October 22, 2008, the California Supreme Court denied the

petition without comment or citation.  *See id.*

On November 17, 2008, Petitioner filed the instant federal habeas petition.  *See* Pet'r's

Pet.  On December 3, 2008, Petitioner consented to the jurisdiction of a United States Magistrate

Judge.  *See* Pet'r's Consent 1.  On June 23, 2009, Respondent consented to the jurisdiction of a

United States Magistrate Judge.  *See* Resp't's Consent 1.  On August 27, 2009, Respondent filed

an answer.  *See* Resp't's Answer, ECF No. 14.  The record does not show that Petitioner filed a

traverse.

## III.  FACTUAL BACKGROUND[1]

> On January 11, 2007, Officer Patricia Varozza pulled over a new
> red Corvette driven by [Petitioner] after [Petitioner] ran a stop sign.
> When the owner of a car dealership identified the car as belonging
> to the dealership, Varozza arrested [Petitioner].

---

[1] These facts are from the California Court of Appeal's opinion issued on August 15, 2008.  *See* Lodged Doc. 6, at 2-6.  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Moses v. Payne,* 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir. 2004).

. . . .

Varozza pulled [Petitioner] over after he ran a stop sign.  She asked
for his driver's license and registration.  [Petitioner] stated he
lacked a license and was test driving the Corvette.  He told
Varozza that his friend Trina was actually test driving the car,
which she had gotten from a Chevrolet dealership.  He met Trina at
a McDonald's restaurant, and Trina let him drive the Corvette to
the store.

When Varozza asked [Petitioner] for the keys, he removed a "key
fob" from his pocket and explained how the keyless entry device
worked.  The Corvette's ignition system did not show signs of
tampering.  Varozza spotted an open container of beer in the car.
Varozza cited [Petitioner] and released him.

However, while Varozza was speaking with [Petitioner], another
officer who had come to the scene called Paul Blanco Chevrolet to
determine whether the car was stolen.  As [Petitioner] began to
walk away, Paul Blanco arrived and identified the Corvette as
belonging to his dealership.  Varozza called [Petitioner] back and
arrested him.

Following his arrest, Varozza questioned [Petitioner] at the jail.
[Petitioner] told Varozza that Trina was also known as Katrina
Lamb, but he hesitated to provide more details out of fear that his
wife would find out.  [Petitioner] had met Katrina at McDonald's
earlier that morning.  She had the car, and [Petitioner] asked to
borrow it to go to the store.  [Petitioner] did not suspect the car had
been stolen since Katrina had given him the key fob.

Blanco had last seen the car the night before and did not know it
was missing until notified by the officer.  At the scene, Blanco
identified the car, which still had the dealership plate and plate
bracket in place.  The only damage to the car was a puddle of
spilled beer on the floor of the front passenger side.  The key fob
was used to start the car; no key was needed.

Around the time the car disappeared, the dealership surveillance
camera was not operating.  The keys for cars at the dealership were
in an unlocked showroom.

At the dealership, when a customer test drove a car, the dealership
made a copy of the customer's driver's license and insurance card.
An employee accompanied the customer on the test drive.  The
Corvette had been last driven a few days previously by a man from
Auburn.  No one at the dealership ever gave [Petitioner]
permission to drive the car, which was valued at between $36,000
and $40,000.

Trina Lamb denied test driving the Corvette and denied she had

3

been at the fast food restaurant the day of the incident.[2]  Trina left [Petitioner] at home while she took their daughter to day care. Their daughter talked to [Petitioner] on the phone on the way to day care; the call ended around 9:45 a.m.  The couple lived about a 10-minute drive from the dealership.  Trina had never gone by the name Katrina.

After his arrest, [Petitioner] twice called Trina from jail.  The phone [Petitioner] used informed callers the call could be recorded or monitored.  In his first call, [Petitioner] told Trina he thought he had run into the man who sold him the car for $100.

[Petitioner] also told Trina he had an "old boy" who was willing to come forward and say he gave [Petitioner] the car for $100. However, [Petitioner] also said that if this person was in jail around the time [Petitioner] "rented" the car, "it ain't going to work."  According to [Petitioner], "basically the overall picture, a thousand I get free."

[Petitioner] said the man's named was John Richardson; he provided Trina with Richardson's jail reference number and asked her to find out when Richardson had been arrested.  If Richardson was arrested after [Petitioner], [Petitioner] stated "there's a green light.  But if it's before that, we might be back to square one.[3]

A few weeks later, [Petitioner] again called Trina from jail and said they "might have to go to Plan B."  [Petitioner] told Trina his "folks" were going to get out and try to find the man who sold him the car.  [Petitioner] also told Trina she was to talk to a man to tell him that she had seen [Petitioner] "out there talking, buying a car." [Petitioner] also worried there might be a surveillance video of the person who took the Corvette's keys.

The parties stipulated that a dealership employee would testify that the morning of [Petitioner's] arrest he observed a black male standing in the dealership's customer service area.  However, the employee could not identify [Petitioner] in court.

The prosecution also presented evidence of two prior incidents involving [Petitioner].  In 1993 a police officer attempted to stop [Petitioner], who was driving a 1990 Geo Storm.  [Petitioner] led the officer on a high-speed chase before crashing the car into a fence.  The car had been stolen from a Chevrolet dealership.  In 1990 police stopped and arrested [Petitioner] for recklessly driving

---

[2] Trina Lamb is [Petitioner's] wife, notwithstanding his earlier statement that he did not want to discuss Trina in case his wife found out.

[3] One John Westly Richardson was in jail from January 2, 2007, through March 11, 2007. [Petitioner] was arrested on January 11, 2007.

4

1  a 1989 Chevrolet Capri.  That car also proved to be stolen from a
2  Chevrolet dealership.

3  ## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS[4]

4  An application for writ of habeas corpus by a person in custody under judgment of a state

5  court can be granted only for violations of the Constitution or laws of the United States.  28

6  U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

7  *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

8  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

9  the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

10  U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999).  Under

11  AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

12  state court proceedings unless the state court's adjudication of the claim:

13  (1) resulted in a decision that was contrary to, or involved an
14  unreasonable application of, clearly established Federal law, as
   determined by the Supreme Court of the United States; or

15  (2) resulted in a decision that was based on an unreasonable
16  determination of the facts in light of the evidence presented in the
   State court proceeding.

17  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

18  *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

19  In applying AEDPA's standards, the federal court must "identify the state court decision

20  that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

21  "The relevant state court determination for purposes of AEDPA review is the last reasoned state

22  court decision."  *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

23  "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

24  orders upholding that judgment or rejecting the same claim rest upon the same ground."  *Ylst v.*

25  _____

26  [4] *But see infra* Part V.B.2.

1    *Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

2    must conduct an independent review of the record to determine whether the state court clearly

3    erred in its application of controlling federal law, and whether the state court's decision was

4    objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  "The

5    question under AEDPA is not whether a federal court believes the state court's determination

6    was incorrect but whether that determination was unreasonable--a substantially higher

7    threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

8    "When it is clear, however, that the state court has not decided an issue, we review that question

9    *de novo*." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

10   545 U.S. 374, 377 (2005)).

11                                          V.  CLAIM FOR REVIEW

12           The petition for writ of habeas corpus sets forth one ground for relief.  Petitioner's ground

13   for relief consists of solely one sentence, i.e., his "conviction [was] obtained by action of a grand

14   or petit jury which was unconstitutionally selected and impaneled." Pet'r's Pet. 4.  Petitioner

15   then refers to "exhibit A." *Id.*  There is no "exhibit A" attached to Petitioner's federal habeas

16   petition.[5]  A review of Petitioner's petition for review, however, clarifies Petitioner's ground for

17   relief.  In Petitioner's petition for review, Petitioner asserts there was "disparity in treatment

18   between the two black jurors who were excused and the white jurors who were left on the jury[,]

19   evinc[ing] discriminatory intent in violation of [Petitioner's] rights under the Sixth and

20   Fourteenth Amendments . . . to an impartial jury selected without discrimination." Lodged Doc.

21   No. 7, at i.  In other words, Petitioner, who is African American, claims his conviction must be

22   reversed because the prosecutor exercised peremptory challenges to strike two black jurors,

23   Donna McClain and Morris Burnett, on the basis of race, in violation of *Batson v. Kentucky*, 476

24   ───────────────

25           [5] Federal courts are highly protective of a pro se petitioner's rights.  For this reason, the
     district court is required to liberally construe a pro se petition.  *Haines v. Kerner*, 404 U.S. 519,
26   520 (1972); *Tatum v. Christensen*, 786 F.2d 959, 963 n.4 (9th Cir. 1985)

1   U.S. 79 (1986).

2       A.  The Record Below

3       The record reflects that there were six African American jurors in the pool of sixty-five

4   "members in the jury panel."  Lodged Doc. No. 3, Rep.'s Appeal Tr. 34; *see also* Lodged Doc.

5   No. 1, Clerk's Tr. 44.  "One was excused by the Court for cause" because she had "a prior

6   vehicle theft in her family."  Lodged Doc. No. 3, Rep.'s Appeal Tr. 34.  "Three made it as far as

7   the jury panel . . . , and the two challenges made by the [State] were African[]Americans."  *Id.*

8   One member of the seated jury, Juror Number 2929357, "appear[ed] to be at least half

9   African[]American," as he "seem[ed] to have an African-sounding last name."  *Id.* at 35.

10  However, although Juror Number 2929357 had "[d]readlocks," he was "light-skinned,"

11  "work[ed] for the Sheriff's Department," and "park[ed] in the same building as the [p]rosecutor

12  in this case."  *Id.*  The two challenged African Americans, Donna McClain and Morris Burnett,

13  were not light-skinned.  *Id.*

14          1.  Prospective Juror Donna McClain and Pertinent Voir Dire Proceedings

15      During voir dire, the following colloquy occurred between McClain and the State:

16          [THE STATE:] . . . Ms. McClain, can you tell us what you do at
            the corrections.

17
18          PROSPECTIVE JUROR MCCLAIN:  I work in personnel.  I'm a
            personnel liaison.

19          [THE STATE:]  How about with the highway patrol?  What do you
            do with them?

20
21          PROSPECTIVE JUROR MCCLAIN:  Analyst with the cadet
            selection program.  That's the first point of contact with anyone
            that wants to become a highway patrol person.

22
23          [THE STATE:]  You were the first point of contact?

24          PROSPECTIVE JUROR MCCLAIN:  (Prospective [j]uror
            nodding head.)

25          [THE STATE:]  So pretty much then you were, I guess, kind of
            inside, kind of behind the scenes type of work as opposed to being
26          out in the field writing tickets and stuff?

7

PROSPECTIVE JUROR MCCLAIN:  Right.

[THE STATE:]  You're not a sworn police officer then?

PROSPECTIVE JUROR MCCLAIN:  No, no.

[THE STATE:]  Okay.  How long have you been, kind of combined, been with the highway patrol and corrections respectively?

PROSPECTIVE JUROR MCCLAIN:  It's been 13 years total. Well, 12 at the highway patrol and -- 12 and a half, and then seven months with corrections.

[THE STATE:]  I think you mentioned -- I'm kind of changing subjects on you a little bit.  Your son, I think you mentioned, was a victim of kind of a mistaken identity?

PROSPECTIVE JUROR MCCLAIN:  Yes.

[THE STATE:]  Was he actually arrested for that?

PROSPECTIVE JUROR MCCLAIN:  Yes.

[THE STATE:]  That crime?

PROSPECTIVE JUROR MCCLAIN:  (Prospective juror nodding head.)

[THE STATE:]  Arrested in Sacramento or [s]outhern California?

PROSPECTIVE JUROR MCCLAIN:  Sacramento.

[THE STATE:]  Which agency arrested him?

PROSPECTIVE JUROR MCCLAIN:  I'm not sure.

[THE STATE:]  Ultimately, sounds as though he was not convicted of any crime?

PROSPECTIVE JUROR MCCLAIN:  No.

[THE STATE:]  Was it dismissed?

PROSPECTIVE JUROR MCCLAIN:  Yes, it was.

[THE STATE:]  Based on your conversations with your son, is it your impression that he was treated fairly by the law enforcement agency that handled his arrest?

1    PROSPECTIVE JUROR MCCLAIN:  I don't know if he was that
     fairly treated.

2
     [THE STATE:]  You don't know if he was that fairly treated?

3
     PROSPECTIVE JUROR MCCLAIN:  No.  I mean, because one
4    thing, they said they had the person's fingerprints, that they had
     arrested the guy, but they never took his fingerprints, but they kept
5    him down at the station all day long and never fingerprinted him or
     anything.

6
     [THE STATE:]  Okay.  So now this is -- how many sons do you
7    have?

8    PROSPECTIVE JUROR MCCLAIN:  One.

9    [THE STATE:]  How many other children do you have besides
     him?

10
     PROSPECTIVE JUROR MCCLAIN:  I have a daughter.

11
     [THE STATE:]  So your son was kind of arrested.  In your mind,
12   there may [have] been some things that the police could have
     done?

13
     PROSPECTIVE JUROR MCCLAIN:  Right.

14
     [THE STATE:]  To right the wrong a little bit faster?

15
     PROSPECTIVE JUROR MCCLAIN:  Right.

16
     [THE STATE:]  When was the wrong righted, so to speak?

17
     PROSPECTIVE JUROR MCCLAIN:  It was that day.

18
     [THE STATE:]  It was that day?

19
     PROSPECTIVE JUROR MCCLAIN:  Yes.

20
     [THE STATE:]  Okay.  Now, I think I asked you, I don't think you
21   said, but do you remember the agency that was doing this?

22   PROSPECTIVE JUROR MCCLAIN:  I don't remember.  I think it
     might have been Sac PD.

23
     [THE STATE:]  May have been Sac PD?

24
     PROSPECTIVE JUROR MCCLAIN:  (Prospective juror nodding
25   head.)

26   [THE STATE:]  In your mind, there was -- if you're kind of

9

1   looking back on it, the officers could have done a much better job
2   dealing with your son?

    PROSPECTIVE JUROR MCCLAIN:  Yes.
3
    [THE STATE:]  In any way do you think that will affect your
4   ability to listen to officers that come in and testify in this case?

5   PROSPECTIVE JUROR MCCLAIN:  No.

6   [THE STATE:]  How long ago was this?

7   PROSPECTIVE JUROR MCCLAIN:  About three years ago.

8   [THE STATE:]  Okay.  Do you talk to your son much about it
    today?
9
    PROSPECTIVE JUROR MCCLAIN:  Not really.  He does not say
10  much about it.

11  [THE STATE:]  Ultimately, doesn't sound like charges were filed
    against your son by the District Attorney's Office; is that correct?
12
    PROSPECTIVE JUROR MCCLAIN:  Right.
13

14  Lodged Doc. No. 4, Rep.'s Augmented Tr. 66-70.  The State thanked and excused McClain.  *Id.*

15  at 79.

16      During voir dire, the prosecutor did not challenge Prospective Juror Alternate, a

17  Caucasian lady who expressed concern over unfair treatment that occurred against her son-in-

18  law.  Lodged Doc. No. 7, at 6-7.  Defense counsel first elicited that Prospective Juror Alternate

19  had her car vandalized about three years prior to when voir dire was conducted.  Lodged Doc.

20  No. 4, Rep.'s Augmented Tr. 89-90.  Her car windows were "smashed in," and someone "tried to

21  get the radio out and remove items from the car."  *Id.* at 90.  Prospective Juror Alternate believed

22  "it was about a thousand dollars to have the passenger side window replaced and mechanism

23  fixed," and nobody was arrested for this.  *Id.*

24      Prospective Juror Alternate then described her daughter and son-in-law's arrest and legal

25  proceedings as follows:

26      PROSPECTIVE JUROR ALTERNATE:  I should mention that -- I

10

didn't even think about it until a second ago -- . . . my daughter and now son-in-law were arrested for trespassing at Ashton Park when they were dating.  Didn't pop in til you talked about is there anything that makes you angry.

I suddenly remembered that -- my daughter is the world's whitest white girl and my son-in-law is a Pacific Islander -- the judge told her that the charges were dismissed, and they told my son-in-law, now son-in-law, that he was going to have to pay a fine until he saw who he was with, and he dismissed the charges on him.

*Id.*  Prospective Juror Alternate affirmed the ordeal was over at the time voir dire took place, but added "it was not a particularly well balanc[ed] handling of the two people . . . . One was dismissed and one was going to be fined." *Id.* at 91.  She also felt that her son-in-law was treated unfairly because of his ethnicity.  *Id.*  She added that "she was also married to a Hispanic and he had the same problem in Los Angeles." *Id.*

        2.  Prospective Juror Morris Burnett and Pertinent Voir Dire Proceedings

      The prosecutor also called, questioned, and excused prospective juror Morris Burnett as follows:

[THE STATE:] . . . Mr. Burnett, I'd like to ask you a couple of questions about your arrest.  When was that, sir?

PROSPECTIVE JUROR BURNETT:  Back in about '96 or '94, around [or] about that time.

[THE STATE:]  Here in Sacramento County?

PROSPECTIVE JUROR BURNETT:  It's Roseville County.

[THE STATE:]  In Roseville.  City of Roseville?

PROSPECTIVE JUROR BURNETT:  Yeah.

[THE STATE:]  And you mentioned it was for a firearm?

PROSPECTIVE JUROR BURNETT:  Yes.

[THE STATE:]  In the car?

PROSPECTIVE JUROR BURNETT:  Yeah, it was in the back of the car.

11

1    [THE STATE:]  But did I understand you correctly to say that charges were never filed or these charges were dismissed?

2

3    PROSPECTIVE JUROR BURNETT:  They kind of dismissed it because the gun that was in the car wasn't actually real.  It was a gun broken in pieces, and my family stuck it in the back of my car.

4

5    [THE STATE:]  Did you feel the fact that you were arrested was proper?  Were your properly arrested in your opinion, sir?

6    PROSPECTIVE JUROR BURNETT:  Not really.  They was given me hassle little bit [sic], where you get this, but, you know, trying to figure out, you know what -- what I was doing in Roseville and all that stuff.  Actually asking me all kinds of questions and stuff.

7

8    [THE STATE:]  You kind of felt you were being hassled by the police?

9

10   PROSPECTIVE JUROR BURNETT:  Yes.  Yes.

11   [THE STATE:]  You understand in this case there will be several police officers that are going to come in and testify?  Do you think that the fact that you were hassled by the police back in that case, '96, would cause you any difficulty in listening to police officer testimony in this case?

12

13

14   PROSPECTIVE JUROR BURNETT:  No, no problem.

15   [THE STATE:]  Once you were arrested, did you feel as though you were treated properly throughout the process, I guess, of the arrest itself?

16

17   PROSPECTIVE JUROR BURNETT:  Well, once we was at the station, they treat me pretty good after that [sic].

18

19   [THE STATE:]  So when you were out in the field was when you feel as though you were being hassled by the police officers?

20   PROSPECTIVE JUROR BURNETT:  Yeah.

21   [THE STATE:]  Aside from that instance back in '96, have you had any other bad experience with law enforcement?

22

23   PROSPECTIVE JUROR BURNETT:  No.

24   [THE STATE:]  Mentioned that there was a robbery at your work.

25   PROSPECTIVE JUROR BURNETT:  Yes.

26   [THE STATE:]  Could you describe what happened in that instance.

PROSPECTIVE JUROR BURNETT:  Well, some employees going out the door and guys had masks and came at gunpoint.

[THE STATE:]  How long ago was this?

PROSPECTIVE JUROR BURNETT:  Actually it was last year 2006.  That was the last one.

[THE STATE:]  Here in Sacramento?

PROSPECTIVE JUROR BURNETT:  Yes.

[THE STATE:]  Was there an arrest made, to your knowledge in the case?

PROSPECTIVE JUROR BURNETT:  No.  Never found the people that did it.

[THE STATE:]  Did you feel as though law enforcement did everything they could do to make an arrest in that case?

PROSPECTIVE JUROR BURNETT:  Well, they working [sic] on it for a while because the store had been robbed more than once.  They working [sic] on it for years.

[THE STATE:]  So it sounds like they put forth a good effort but were not able to identify the people that did it?

PROSPECTIVE JUROR BURNETT:  Yeah.

[THE STATE:]  Anything about that instance that you can think of might cause you difficulty sitting as a juror in this case?

PROSPECTIVE JUROR BURNETT:  No.

[THE STATE:]  What's a hitch pro?

PROSPECTIVE JUROR BURNETT:  I put hitches on cars.

[THE STATE:]  That's U-Haul?

PROSPECTIVE JUROR BURNETT:  Yes.

*Id.* at 91-95.  The State thanked and excused Burnett.  *Id.* at 96.

The prosecutor did not excuse Prospective Juror No. 10 or Prospective Juror Alternate, who both had convictions for driving under the influence (DUI).  *Id.* at 44, 85-86.  Prospective Juror No. 10 had his DUI charge in 1975 and was arrested by the California Highway Patrol.  He

1  bore no "ill will toward peace officers because of that old matter," only that "it didn't occur

2  sooner," because it "[t]ook care of the problem." *Id.* at 44.  Prospective Juror Alternate had a

3  DUI charge in 1983 and was arrested by a sheriff.  *Id.* at 85-86.  She answered that she was

4  treated correctly, and "ha[d] to agree it was way overdue, and [she] no longer drink[s]." *Id.* at 86.

5  　　　　　　　　　3.  Trial Court Hearing and Ruling

6  　　　　On April 24, 2007, the trial court discussed defense counsel's motion under *People v.*

7  *Wheeler*, 22 Cal.3d 258, 148 Cal. Rptr. 890, 583 P.2d 748 (1978).[6]  The trial court allowed

8  defense counsel to speak first since it was his motion.  Defense counsel stated, *inter alia*:

9  　　　　　　The [p]rosecution exercised a grand total of two peremptory
　　　　　　　challenges during jury selection, and both potential jurors

10  　　　　　　challenged were African[]American.  That in and of itself
　　　　　　　constitutes a prima facie showing.

11

12  Lodged Doc. No. 3, Rep.'s Appeal Tr. 34.  When the trial court pointed out that one member of

13  the jury was African American, defense counsel noted he was "light-skinned as opposed to these

14  other two African[]Americans that were challenged by the [p]rosecution, and he also works for

15  the Sheriff's Department and parks in the same building as the [p]rosecutor in this case." *Id.* at

16  35.  The trial court then allowed the prosecutor to speak, "[w]ithout accepting the fact that a

17  prima facie case has been established." *Id.*

18  　　　　The prosecutor explained his reasons for exercising its peremptory challenges.  For

19  McClain, the prosecution reasoned, in relevant part:

20  　　　　　　My case is basically a car case.  [Petitioner] is driving a brand new
　　　　　　　2007 Corvette with absolutely no damage . . . .

21

22  　　　　　　Most car cases . . . involve the screw driver in the ignition, the
　　　　　　　wires hanging from the steering column.  There's some sort of
　　　　　　　evidence . . . that we can make a rational inference, hey, this guy

23  　　　　　　knew the car was stolen.

24  _____

25  　　　　[6] *Wheeler* is "the California counterpart to *Batson*." *Yee v. Duncan*, 463 F.3d 893, 896
(9th Cir. 2006), *cert. denied*, 552 U.S. 1043 (2007).

26

14

But when you look at the facts of this case, you really don't have that, and that has basically put me in the position of putting on [Petitioner's] statement, and . . . I don't like putting a defendant's statement on.

But in this case as a matter of strategy I have chosen to put [Petitioner's] statement on.  That strategy requires that the credibility of Sacramento Police Officer Varozza . . . be held in . . . very high regard. . . .

When we look as Miss McClain . . . I've got a potential juror who had a negative contact[] through a family member, with the Sacramento Police Department. . . . [H]er tone of voice and voice inflection, what I gathered and what I saw from her, [was] that she was not real happy with the officers that arrested her son.

Coupled with the fact that it's only three years ago.  It's very recent. . . .

. . . .

. . . [At] first blush[,] when you look at Ms. McClain as a potential or prespective [sic] juror, you know, here's a person that's got some background with the California Highway Patrol.  Here's a person who currently works with the Corrections Department.

. . . [A]n argument may very well be made [that] . . . the DA would be chomping at the bit to get her in here as a juror, but my experience is not the case with respect to office staff, support-type of folks.

At the District Attorney's Office[,] we have a lot of staff, people that are kind of behind the scenes that I would equate as similar to Ms. McClain, and I would be very reluctant to have them serve as jurors.

So I put absolutely no weight on the fact that she had been working for the Highway Patrol or currently worked for Department of Corrections based on the fact that she was not sworn, based on the fact that she was more of a behind-the-scenes person as opposed to being out in the street fighting crime herself.

. . . .

The other thing that kind of troubled me about her statement [was] . . . , it was a one-day deal and it seemed like it all got cleared up at the end of the day. . . . I would kind of think no harm, no fo[u]l, and I really wasn't hearing that from her.

*Id.* at 36-39, 41.

15

1     The prosecution then commented on why Burnett was excused:

2           I was extremely reluctant to leave a person who had been arrested
            at all on the jury for any reason, certainly a weapons offense would
3           be no exception, coupled with the fact that the weapons offense
            never really panned out.
4
            I mean, possession of a firearm charge to me seems like a very
5           simple case, but then, according to him, for whatever reason it
            never got . . . filed because . . . I think what he said was parts of a
6           gun or there was just a lot of cloudiness.

7           And what I gathered from . . . Mr. Burnett was that he was not a
            particularly articulate man which is something that I like to have in
8           a juror.

9           I had difficulty in understanding what a lot of his responses were
            and I have some reservations as to whether or not, just based on the
10          difficulty I was having in understanding him explain what
            happened to him, whether or not he would be able to deliberate and
11          work well with the other jurors.

12          . . . .

13          The other thing I noted about Mr. Burnett was that . . . I thought
            that Mr. Burnett was wearing dirty clothing.  It was a U-Haul
14          uniform that he was wearing, but his pants and shirt were clearly
            soiled . . . [.]
15
            Anybody that I see wearing dirty clothing in court, I see that as a
16          lack of respect for the Court . . . .

17   *Id.* at 40-42.  The prosecution also added that for the two jurors who had DUIs, those jurors

18   expressed they were positive experiences for them.  *Id.* at 43.

19          The trial court allowed defense counsel to respond.  *Id*. at 44.  Defense counsel pointed

20   out it does not matter whether Asian American and Hispanic individuals made it onto the jury,

21   because the dispute involves "the systematic exclusion of African[]Americans from the jury."  *Id.*

22   Defense counsel mentioned, "I think if you were to take a poll of most African[]Americans in

23   this country, you would find that most African[]Americans feel that they are not treated fairly by

24   law enforcement by virtue of being African[]American."  *Id*. at 45.  Defense counsel reiterated

25   that McClain would be the "perfect . . . jury duty" candidate for the prosecution because she (1)

26   was a former California Highway Patrol employee; (2) had "numerous friends" there; (3) was a

16

1  current Department of Corrections employee; and (4) said "she could be a fair and impartial juror

2  in this case." *Id.* at 45-46.  Defense counsel also addressed the State's contention that Burnett

3  wore dirty clothes, stating he "didn't notice that," and "he's a working man." *Id.* at 46.  Defense

4  counsel noted "that more than one Caucasian raised his or her hand when asked if they had

5  negative experiences with law enforcement, and it was only the African[]Americans that were

6  excused by the [p]rosecution." *Id.* at 47.

7         The trial court denied the motion, stating:

8               Well, I think at this point I have to say that [defense counsel] has
               indeed established a prima facie case of systematic exclusion of a
9               certain group of people.

10              Considering, however, the reasons given, the statements made by
               the [State] in this particular matter, it would appear that [defense
11              counsel] has not proved a purposeful racial discrimination
               exercised by the [State].
12
               The reasons given for excluding those two potential jurors appear[]
13              from the information and the recollection [of] the Court as to what
               was stated, what responses that those two gave to questions put by
14              the Court, as well as by counsel that would create a . . . concern as
               to the possibility that either one or both of those persons who were
15              challenged might not be able to approach this matter with an open
               mind free of all past experiences that might conflict with their
16              ability to be totally fair and balanced in their decision in this
               particular matter.
17
               And the Court does accept the reason tendered by [the State] in this
18              particular matter, and on that basis[,] does deny the motion.

19  *Id.* at 48-49.

20              4.  California Court of Appeal Decision

21         The California Court of Appeal rejected Petitioner's *Batson* claim, stating in relevant

22  part:

23              A prosecutor's use of peremptory challenges to strike prospective
               jurors on the basis of group bias against members of an identifiable
24              group distinguished on racial, ethnic, or similar grounds violates a
               defendant's right to a jury trial drawn from a representative
25              cross-section of the community.  (*Wheeler*, *supra*, 22 Cal.3d at pp.
               276-277.)  When a *Wheeler/Batson* motion is made the issue is not
26              whether there is a pattern of systematic exclusion, but whether a

17

particular prospective juror has been challenged because of group bias.  (*People v. Avila* (2006) 38 Cal.4th 491, 549 (*Avila*).)

Trial courts employ a three-step process when deciding motions challenging peremptory strikes.  First, the defendant must make out a prima facie case by showing that the totality of relevant facts gives rise to an inference of discriminatory purpose.  Second, once the defendant makes out a prima facie case, the burden shifts to the prosecution to explain the exclusion by offering permissible race-neutral justifications.  Third, if a race-neutral explanation is offered, the court must decide whether the defendant has proved purposeful racial discrimination.  (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129].)

On appeal, we review the trial court's ruling under the substantial evidence standard.  We presume the prosecution uses peremptory challenges in a constitutional manner, and we defer to the court's ability to distinguish between bona fide reasons and sham excuses.  If the court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, we defer to the court's ultimate conclusions.  (*Avila*, *supra*, 38 Cal.4th at p. 541.)

**Prospective Juror McClain**

. . . .

***Discussion***

[Petitioner] contends the prosecution's stated reasons for excluding McClain were a pretext for discrimination.  [Petitioner] focuses on McClain's involvement in the hiring of officers for the California Highway Patrol as suggesting she would be a favorable juror for the prosecution.  In addition, [Petitioner] argues another juror who was not excused had similar problems with law enforcement.  According to [Petitioner], the prosecution's failure to extensively question this juror, who was white, suggests his stated reason for excusing McClain was a sham.

We disagree.  McClain's comments during voir dire indicated her discomfort with how officers treated her son.  The prosecutor explained his reasons for avoiding jurors who had negative associations with the police, citing the credibility of Officer Varozza as a central issue in the case.  Notwithstanding McClain's involvement with the California Highway Patrol, the prosecution's reasons for excluding McClain were both plausible and supported by the record.

As for the other juror, who stated her daughter and son-in-law had been arrested, the juror, who was Caucasian, had not initially remembered the incident.  The juror did not express concern about the police but stated the judge on the case had not been balanced or

18

fair.  The juror provided an extensive description of the incident, obviating the need for the prosecution to further question her on the matter.

**Prospective Juror Burnett**

. . . .

***Discussion***

[Petitioner] contends other jurors suffered arrests, but the prosecution failed to question them as extensively as he questioned Burnett.  [Petitioner] also challenges the prosecution's concerns about Burnett's ability to articulate his thoughts and his criticism of Burnett's clothing.  According to [Petitioner], the prosecution "threw in" these additional justifications, which merely serve to undermine the prosecution's credibility.

We disagree with [Petitioner's] analysis.  Burnett stated he felt hassled by police during his arrest on a weapons charge.  The prosecution explained his reasoning for dismissing jurors who had negative associations with the police, and Burnett's answers in voir dire raised the specter of just such negative associations.

[Petitioner] argues other jurors who were not African[]American had similar problems with law enforcement but were not dismissed.  However, Juror Alternate, who had been arrested and pled guilty to a driving under the influence (DUI) charge in 1983, stated she was treated absolutely correctly and that her arrest was "way overdue."

Juror No. 10 had been arrested and pled no contest to a DUI charge in 1975.  The juror stated he wished the arrest had come sooner, that he was guilty, and that it took "care of the problem."

Neither of these jurors expressed any negative feelings about their arrests or treatment by law enforcement.  In contrast, both Burnett and McClain felt officers had behaved inappropriately in conjunction with the arrests in question.

Nor do we find the prosecution's other rationale for dismissing Burnett undermines the prosecution's credibility.  The trial court was perhaps in the best position to judge both Burnett's demeanor and dress.  The court did not find these stated reasons pretextual, and we decline to substitute our judgment on appeal. (*People v. Stanley* (2006) 39 Cal.4th 913, 939.)

The record supports the prosecution's stated, neutral reasons for dismissing the two jurors, and the court did not err in denying [Petitioner's] motion.

1   Lodged Doc. No. 6, at 8-13.

2        B.   Legal Standard for *Batson* Claims

3             1.   Third-Step *Batson* Claims

4        In *Batson*, the Supreme Court held that an African American defendant stated an Equal

5   Protection claim based on allegations that the prosecutor at his trial had exercised peremptory

6   strikes in a manner allegedly intended to prevent any African Americans from serving on the

7   petit jury.  476 U.S. at 96-98.  Under *Batson* and its progeny, courts apply a three-step analysis to

8   claims of racial discrimination in the exercise of peremptory challenges:

9             First, a defendant must make a prima facie showing that a
              peremptory challenge has been exercised on the basis of race[;
10            s]econd, if that showing has been made, the prosecution must offer
              a race-neutral basis for striking the juror in question[; and t]hird, in
11            light of the parties' submissions, the trial court must determine
              whether the defendant has shown purposeful discrimination.

12

13   *Synder v. Louisiana*, 552 U.S. 472, 476-77 (2008) (citation and internal quotation marks

14   omitted); *Johnson v. California*, 545 U.S. 162, 168 (2005); *Purkett v. Elem*, 514 U.S. 765, 767

15   (1995); *see also Hernandez v. New York*, 500 U.S. 352, 358-59 (1991).

16        In *Snyder*, the Supreme Court stated that the third Batson step "involves an evaluation of

17   the prosecutor's credibility," and that "the best evidence of discriminatory intent often will be the

18   demeanor of the attorney who exercises the challenge."  552 U.S. at 477 (citation and internal

19   quotation marks omitted); *see also Hernandez*, 500 U.S. at 365 ("[T]he best evidence [of

20   discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.");

21   *Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003) ("A finding of discriminatory intent turns

22   largely on the court's evaluation of the prosecutor's credibility." (quoting *McClain v. Prunty*, 217

23   F.3d 1209, 1220 (9th Cir. 2000))).  The ultimate determination of whether the prosecutor acted

24   with discriminatory intent resolves a question of fact.  *See Purkett*, 514 U.S. at 769; *see also Rice*

25   *v. Collins*, 546 U.S. 333, 338-39 (2006); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)

26   ("*Miller-El II*") (citing *Purkett*, 514 U.S. at 769; *Batson*, 476 U.S. at 98 n.21).

A prosecutor's "[c]redibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) ("*Miller-El I*"). However, "the critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Id.* at 338-39 (citing *Purkett*, 514 U.S. at 768); *see also Purkett*, 514 U.S. at 768 ("[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.").

A court is "not bound to accept at face value [the prosecutor's] list of neutral reasons that are either unsupported in the record or refuted by it." *Johnson v. Vasquez*, 3 F.3d 1327, 1331 (9th Cir. 1993). "The fact that one or more of a prosecutor's justifications do not hold up under judicial scrutiny militates against the sufficiency of a valid reason." *McClain*, 217 F.3d at 1221; *see also Lewis*, 321 F.3d at 831 ("The proffer of various faulty reasons and only one or two otherwise adequate reasons, may undermine the prosecutor's credibility to such an extent that a court should sustain a *Batson* challenge.").

A prosecutor's motive may be inferred from the totality of the relevant facts. *See Hernandez*, 500 U.S. at 363 (citation omitted). Thus, "in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder*, 552 U.S. at 478. For instance, a "[c]omparative juror analysis" is "an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group." *Boyd v. Newland*, 467 F.3d 1139, 1145 (9th Cir. 2006); *see also Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006) ("The totality of the relevant facts . . . includes . . . the characteristics of people [the prosecutor] did not challenge." (citation and internal quotation marks omitted)).

///

21

2.  Evaluation of Third-Step *Batson* Claims under AEDPA

Prior to the passage of AEDPA in 1996, and applying former 28 U.S.C. § 2254(d)(8), the Supreme Court concluded that, on federal habeas review, a state trial court's factual finding that the prosecutor's reasons for striking a juror was race-neutral, and not a pretext to mask purposeful discrimination, was entitled to a rebuttable presumption of correctness.  *See Purkett*, 514 U.S. at 769.  The Supreme Court indicated that this finding would act to foreclose relief on a third-step *Batson* claim, if a habeas petitioner did not rebut the attendant presumption of correctness.  *See id.*  Following AEDPA's passage, and consistent with *Purkett* and other Supreme Court law on the issue,[7] the Supreme Court has indicated that this deference to the state trial court continues.

However, there is some uncertainty as to whether the AEDPA standard of review set forth in 28 U.S.C. § 2254(d)(2), 28 U.S.C. § 2254(e)(1), or both, applies to state court factual findings and/or determinations on *Batson* claims.  *See Rice*, 546 U.S. at 338-39, 342 (applying section 2254(d)(2) to "whether the trial court's factual determination at Batson's third step was unreasonable" on an *arguendo* basis; declining to address "question" of "whether and when" section 2254(e)(1) presumption applied; noting but not discussing *Miller-El II*, 545 U.S. at 240, which indicated Supreme Court's own prior concurrent application of section 2254(d)(2) and (e)(1) on a third-step *Batson* claim); *see also Miller-El II*, 545 U.S. at 240 (applying sections 2254(d)(2) and 2254(e)(1) where *Batson* claim was decided on record and on evidence not before state court); *Miller-El I*, 537 U.S. at 339-41, 348 (stating that, "[t]o secure habeas relief, [a] petitioner must demonstrate that a state court's finding of the absence of purposeful discrimination was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and that

---

[7] *See, e.g.*, *Hernandez*, 500 U.S. at 367, 369 ("*Batson*'s treatment of intent to discriminate [is] a pure issue of fact, subject to review under a deferential standard [and] accords with our treatment of that issue in other equal protection cases[,]" and "we decline to overturn the state trial court's finding on the issue of discriminatory intent unless convinced that its determination was clearly erroneous.").

1    the corresponding factual determination was 'objectively unreasonable' [under 28 U.S.C. §

2    2254(d)(2)] in light of the record before the court" (citations omitted)).  *Compare Green v.*

3    *LaMarque*, 532 F.3d 1028, 1031 & n.5 (9th Cir. 2008) (applying section 2254(d)(2) where

4    *Batson* claim was based and decided on state record, but noting Petitioner also met standard

5    under section 2254(e)(1)), *and Kesser*, 465 F.3d at 358 n.1 (same), *with Mitleider v. Hall*, 391

6    F.3d 1039, 1046-47 (9th Cir. 2004) (applying, *inter alia*, sections 2254(d)(2) and 2254(e)(1)

7    where *Batson* claim was based and decided on the state record), *and Williams v. Rhoades*, 354

8    F.3d 1101, 1106, 1109 (9th Cir. 2004) (same).

9        Section 2254(d)(2) provides that federal habeas relief "shall not be granted with respect to

10   any claim that was adjudicated on the merits in State court unless the adjudication of the claim . .

11   . resulted in a decision that was based on an unreasonable determination of the facts in light of

12   the evidence presented in the State court proceedings."  Section 2254(e)(1) adds that, "[i]n a

13   proceeding instituted by an application for a writ of habeas corpus by a person in custody

14   pursuant to the judgment of a State court, a determination of a factual issue made by a State court

15   shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the

16   presumption of correctness by clear and convincing evidence."

17       Here, the question of which AEDPA standard applies is academic, because the record

18   satisfies either standard.  Under section 2254(d)(2), neither the trial court's factual determination,

19   nor the California Court of Appeal's decision, was "an unreasonable determination of the facts in

20   light of the evidence presented in the State court proceedings."  And under section 2254(e)(1), by

21   clear and convincing evidence, Petitioner does not rebut any presumption of correctness attached

22   to either the trial court's factual determination, or the California Court of Appeal's decision, of

23   no racial discrimination in the prosecutor's peremptory challenges.

24       C.  Analysis of *Batson* Claim

25       The record shows the prosecutor provided credible, non-discriminatory reasons for each

26   use of his peremptory challenges.  First, the record reveals that McClain's son was "arrested"

23

because he was "a victim of kind of a mistaken identity."  Lodged Doc. No. 4, Rep.'s Augmented

Tr. 67.  This happened about three years ago.  *Id.* at 70.  McClain clearly stated that she "d[id]n't

know if [her son] was that fairly treated," as "there may have been some things that the police

could have done . . . [t]o right the wrong a little bit faster," even though the "wrong [was] righted

. . . that day."  *Id.* at 69.

McClain's answer contrasts Prospective Juror Alternate's answers, as Prospective Juror

Alternate expressed anger with "the *judge*," and not the police.  *Id.* at 90 (emphasis added).

Prospective Juror Alternate noted the judge dismissed trespassing charges against her daughter,

"the world's whitest white girl."  *Id.*  According to Prospective Juror Alternate, the judge,

however, but did not dismiss charges against her son-in-law, who "[wa]s a Pacific Islander,"

"until [the] judge saw who he was with."  *Id.*

The prosecutor explained that his strategy in the instant case depended on the "credibility

of Sacramento Police Officer Varozza . . . be[ing] held in . . . very high regard."  Lodged Doc. 3,

Rep's Appeal Tr. 37.  Because the "brand new 2007 Corvette" here had no damage showing it

was stolen (e.g., "wires hanging from the steering column"), the prosecutor felt forced to "put[]

on [Petitioner's] statement," which he "rarely, rarely, rarely" does.  *Id.* at 36-37.  The prosecutor

emphasized, "Just as a matter of policy, . . . I don't like putting a defendant's statement on."  *Id.*

at 37.  The prosecutor "d[id] not want any jurors to have any issues with the Sacramento Police

Department."  *Id.*  And, according to the prosecutor, McClain's "tone of voice and voice

inflection" showed "she was not real happy with the officers that arrested her son."  *Id.* at 38.

The prosecutor noted, since the incident occurred three years ago, "[n]ot a lot of time has passed

to allow any of those bad feelings to . . . settle down."  *Id.*  The prosecutor's strategy was not

implausible or fantastic.  To the extent the prosecutor relied on his instincts in dismissing

McClain based on her tone of voice, it is not improper for a prosecutor to rely on "nothing more

than a trial lawyer's instincts about a prospective juror" during the voir dire process.  *See United*

*States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (quoting *United States v. Chinchilla*, 874 F.2d

695, 699 (9th Cir. 1989)).

Second, the record supports the prosecutor provided credible, non-discriminatory reasons for excusing Burnett.  Burnett felt his arrest for possession of a firearm was not proper, stating that the police "hassle[d]" him a "little bit" by "asking [him] all kinds of questions and stuff." Lodged Doc. No. 4, Rep.'s Augmented Tr. 92.  Burnett noted that "once we was at the station, they treat me pretty good [sic] after that."  *Id.* at 93.  The prosecutor reasoned Burnett probably thought, when he was arrested, that "out in the field, the officers were acting one way, but once they got into an area where there is maybe more people watching them, they were acting another way."  Lodged Doc. No. 3, Rep.'s Appeal Tr. 40.  The prosecutor was "extremely reluctant to leave a person who had been arrested at all on the jury for any reason, . . . coupled with the fact that the weapons offense never really panned out."  *Id.*  The prosecutor also observed that Burnett "was not a particularly articulate man" and may not "be able to deliberate and work well with the other jurors."  *Id.* at 41.  The prosecutor noted Burnett wore "dirty clothing in court," which the prosecutor saw "as a lack of respect for the Court and the decorum of these proceedings."  *Id.* at 42.

In contrast, Prospective Juror Alternate and Prospective Juror No. 10, who were both arrested for DUIs, commented it "was way overdue," and wished it "occurr[ed] sooner," respectively.  *Id.* at 44, 83.  The prosecutor recognized that Prospective Juror Alternate and Prospective Juror No. 10 both reacted positively to their DUI charges, and Juror No. 1 had "several DUI's in her family, and there was . . . no negative association with law enforcement." *Id.* at 43.  The prosecutor expressed genuine, non-racial motives for excusing Burnett.  *See generally*, *e.g.*, *Purkett*, 514 U.S. at 769 ("The prosecutor's proffered explanation in this case -- that he struck juror number 22 because he had long, unkempt hair, a mustache, and a beard -- is race neutral and satisfies the prosecution's step two burden of articulating a nondiscriminatory reason for the strike.  'The wearing of beards is not a characteristic that is peculiar to any race.' And neither is the growing of long, unkempt hair.  Thus, the inquiry properly proceeded to step

three, where the state court found that the prosecutor was not motivated by discriminatory intent." (quoting *Equal Emp't Opportunity Comm'n v. Greyhound Lines, Inc.*, 635 F.2d 188, 190 n.3 (3d Cir. 1980)).

Third, the prosecutor said nothing during the jury selection process that would support an inference that he was biased against African American jurors. *See Batson*, 476 U.S. at 97 ("[T]he prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose."). The trial court questioned first the prospective jurors on their background information. *See*, *e.g.*, Lodged Doc. No. 4, Rep.'s Augmented Tr. 8-58, 80-89. Based on their answers, the prosecutor asked similar questions to most jurors about their history with the legal system and feelings toward law enforcement officers, which was important to his trial strategy. *See*, *e.g.*, *id.* at 70-71 (prosecutor asked Prospective Juror No. 5 whether she had any "hard feelings then against the law enforcement officers" due to three DUI charges in her family); *id.* at 74 (prosecutor asked Prospective Juror No. 11 whether her husband was "treated fairly by the police officers"); *id.* at 76 (prosecutor asked Prospective Juror No. 12 whether she had "any anger on [her] behalf or on [her] friend's behalf that law enforcement was not able to solve the crime"); *id.* at 77 (prosecutor asked Prospective Juror No. 2 whether his family felt law enforcement did an "adequate job" when "no arrests [were] made" on a "home invasion style robbery" at his uncle's home); *id.* at 95 (prosecutor asked Prospective Juror Olivares whether she felt her husband was "treated properly by law enforcement"). The record does not reflect that the prosecutor questioned McClain or Burnett any differently than the non-African American prospective jurors. Petitioner is not entitled to relief on his *Batson* claim.

## VI.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Petitioner's application for writ of habeas corpus is DENIED and DISMISSED with prejudice;

1       2.  The Clerk of Court is DIRECTED to enter judgment; and

2       3. The Court DECLINES to issue a certificate of appealability.

6  DATED:      December 22, 2010.

                               TIMOTHY J BOMMER
                               UNITED STATES MAGISTRATE JUDGE